WHITEFORD, TAYLOR & PRESTON LLP
220 White Plains Road, Second Floor
Tarrytown, NY 10591
(914) 761-8400
klewis@wtplaw.com
Kenneth M. Lewis

*Proposed Attorneys for the Debtors
and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
In re:

Prince Bakery, Inc., *et al.*,

                                    Debtors.[1]
-------------------------------------------------------x

Chapter 11

Case No. 21-_____

(Joint Administration Requested)

### DECLARATION OF ANTHONY M. RUSCIANO PURSUANT TO RULE 1007-2 OF THE LOCAL BANKRUPTCY RULES FOR THE SOUTHERN DISTRICT OF NEW YORK

I, Anthony M. Rusciano, make this declaration under 28 U.S.C. § 1746:

1.      I am the Chairman and President of Prince Bakery, Inc. ("Prince"), Prince Bakery SA, Inc. ("Prince Bakery SA") and Blue Spruce Corporation ("Blue Spruce", and together with Prince and Prince Bakery, SA, the "Debtors").

2.      I also own 100% of the stock of Prince Bakery SA.

3.      I submit this Declaration pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York.

### Background

4.      Prince is a small commercial bakery located at 2418 Belmont Avenue, in the Bronx.

---

[1] The Debtors in these chapter 11 cases, for which joint administration will be requested, along with the last four digits of their federal tax identification numbers, are as follows: Prince Bakery, Inc. (0067); Prince Bakery SA, Inc. (7313); and Blue Spruce Corporation (2675).

Prince was formed in 1954 by Rosario Iacono, my father-in-law. The building in which Prince is located is owned by Blue Spruce, which is also a corporation that was formed by my father-in-law, in 1996. Prince is the only tenant at Blue Spruce's building.

5.      After my father-in-law died in 2000, his stock ownership in Prince and Blue Spruce was acquired by his only two children, his two daughters: my wife Frances Rusciano, and her older sister, Rose Marie Koeper. My wife and her sister each held 50% of the stock of Prince and Blue Spruce. (My sister-in-law died in March 2019, and her shares are now held by her daughter, our niece, Constance Koeper.)

6.      For many years before and after Rosario's death, from 1992 to 2015, I was the person responsible for managing and operating Prince's bakery business, and during the time I managed and operated the bakery, it generated a profit.

7.      Several years ago, after their father's death, my wife and her sister began to fight about the business: my wife thought Rose Marie was stealing from the business, and Rose Marie thought I was stealing from the business. In fact, Rose Marie was stealing from Prince. And in 2015, I formed Prince Bakery SA, Inc., in order to keep Prince's business operating and to keep Rose Marie from taking all of the revenues and profits. (The "SA" in the name of this corporation refers to our sons, Santo and Anthony, who my wife intended would one day inherit at least her share of the business.)

8.      In 2016, my wife filed a lawsuit against her sister, including derivative claims on behalf of Prince and Blue Spruce titled: *Frances Rusciano, on her own behalf, and Derivatively on behalf of Prince Bakery, Inc. and Blue Spruce Corporation v. Rose Marie Koeper*, Westchester County Index No. 69638/2016 (the "State Court Action").

9.      In or about 2017, my sister-in-law, who was then president of both Prince and Blue

2

Spruce, countered my wife's lawsuit by suing me in that same litigation. She used her position as President to have both corporations sue me, and she sued me individually as well. As a result, the caption of the State Court Action became *Frances Rusciano, on her own behalf, and Derivatively on behalf of Prince Bakery, Inc. and Blue Spruce Corporation v. Rose Marie Koeper;* and *Prince Bakery Inc., Blue Spruce Inc., Rose Marie Koeper, as President of Prince Bakery Inc. and Blue Spruce Corporation and Rose Marie Koeper, as an individual v. Anthony M. Rusciano.*

10.     Shortly after she commenced that vindictive litigation, my sister-in-law sought the appointment of a temporary receiver, ostensibly in order to keep me out of Prince's business.

11.     In March 2017, the Supreme Court appointed a temporary receiver, Joseph Maria, Esq., and gave him the following limited power with respect to Prince and Blue Spruce, to:

> … oversee, manage and maintain *any monies that have been and/or will be generated* by the subject bakery and property of PRINCE BAKERY and BLUE SPRUCE CORPORATION, *ascertaining and computing any amounts due to Parties herein for normal disbursements and/or for creditors* of PRINCE BAKERY and BLUE SPRUCE CORPORATION, until such time as the court may direct that this Receivership is terminated. [Emphasis added.]

12.     In January 2018, my wife Frances's claims were abandoned and dismissed. Thereafter, the State Court Action was prosecuted by Rose Marie and, after her death in 2019, Rose Marie's daughter (my niece) moved the State Court for permission to continue the litigation. The Debtors, however, moved the State Court to dismiss their claims in the State Court Action.

### Circumstances Leading to the Chapter 11 Cases

13.     The Debtors have been forced to commence these chapter 11 cases because the receiver is destroying the businesses: the businesses have run out of money, they cannot pay their debts as they come due, there is substantial trade debt, and long-standing vendors will no longer extend credit to the receiver. I have been advised by some of the vendors that the receiver and his

3

"manager" do not return phone calls, they do not make timely payments for supplies, and they are bouncing checks. The receiver has recently advised the State Court and the parties in the State Court Action that unless the shareholders – my wife and her niece – lend money to the companies to allow the receiver to pay their debts, he will close Prince's business, thereby irrevocably jeopardizing Prince as a going concern and endangering the employment and income of all of its employees. Prince is a small bakery and if it's closed even for a day or two, those customers that it has managed to keep despite the COVID-19 pandemic will be forced to buy their bread elsewhere.

14.    The receiver has recently admitted that despite the almost four years since he was appointed, he is unable to operate Prince at a profit. The receiver also shut down the answering service on the bakery's telephone number, thus preventing customers and potential customers from calling and reaching the bakery.

15.    Yet, the receiver refuses to terminate his receivership and allow the Debtors to resume operating their businesses. The only reason for him to continue as receiver is to generate additional commissions for himself and fees for his so-called "manager." The receiver would rather pay himself than pay Prince's vendors and creditors. That is not good for the Debtors or their creditors. And the situation is getting worse by the day.

16.    By letter dated January 13, 2021, the receiver advised the State Court and the parties in the State Court Action that he had trade debt of more than $110,000, as shown below:

| (a) | Sidco foods baking ingredients | $10,300 |
| (b) | US Flour | $30,000 |
| (c) | Four Suns Oil | $11,000 |
| (d) | Advantage Paper | $ 5,000 |
| (e) | Panama City Bread Bags | $38,000 |
| (f) | Arma Container trash removal | $ 9,000 |
| (g) | Property taxes and water charges – | |

4

approximately                    $ 9,000

and that he did not have the money to pay those bills. Vendors and suppliers, like US Flour and

Four Suns Oil, demanded payment or COD before they would accept an order, and they were

reluctant to extend the receiver any further credit.

17.    In that same letter, the receiver advised us *for the first time* that "we are finally out

of flour and being forced to close on Monday as we have no money to buy flour." A bakery that

has no money to buy flour is not a bakery!

18.    The receiver closed his letter begging for money: "Without the parties putting in

$50,000.00 each, we will have to close on January 18, 2021 as there will be no flour to make

bread."[2]

19.    My wife and I initially refused to provide the receiver with the funds he requested,

because he could not give us any assurance of how he would use the funds, how much time the

cash infusion would buy until he came back asking for more money, and what his plan was for

avoiding a recurrence of this same precipitous situation. We also insisted that if we provided any

money, it could not be used to pay his commissions or the fees of his "no-show" manager. The

receiver refused. He wanted to be able to use our money to pay his "manager" at the rate of $1,500

per week. And we don't even know what the manager does to earn that salary. (Although my

niece's lawyer initially suggested that she might provide some funds, Constance apparently was

---

[2] In response to the receiver's letter, my lawyer wrote to the State Court advising, among other things, that "A temporary receiver only has the powers conferred upon him by the Court, and those powers are limited by statute. CPLR 6401. While a permanent receiver may have the power to discontinue the operations of an insolvent business, *see Key Bank of New York v. Anton*, 241 A.D.2d 482, 483-44 (2d Dep't 1997), a temporary receiver has no such power. CPLR 6401. 'Receivers appointed *pendente lite* are, however, mere temporary officers of the court, and do not possess the powers of a permanent receiver, unless specially conferred upon them by order of the court.' *Decker v. Gardner*, 124 N.Y. 334, 338 (1891)." Although the State Court held a conference, it took no action to restrain the receiver from closing Prince's business and only insisted that the parties had to come up with the money to bail out the receiver.

5

unable to do so.)

20.     In addition to the foregoing trade debt, I knew that the receiver had generated other debts and liabilities that he had ignored. For example, in October 2020, he advised the parties that $140,328.77 were due for unpaid real estate taxes (that liability has grown to $149,259.23), and $46,325.26 were due and owing for water charges (which are still outstanding and are not $9,000, as the receiver claimed, but are more than $59,000). And, in November 2020, I learned that the State of New York Workers' Compensation Board had obtained a $25,000 judgment on November 6, 2020 against Prince Bakery SA, for penalties imposed due to his failure to respond to their requests for information for the period December 2018 to August 2019, during the receivership.[3] That judgment remains unpaid.

21.     The receiver's bank statement for December 2020 (which was filed in the State Court Action only after my attorney requested it) reveals that during 2020, he bounced no fewer than 22 checks; and, as noted, I have been receiving reports from other creditors that he is continuing to bounce checks on them.

My Motion to Discharge the Receiver

22.     In March 2020, shortly before the COVID-19 pandemic hit, I engaged new counsel to represent me in the State Court Action. My new counsel filed a motion seeking, among other relief, an order discharging the receiver on the grounds of his misconduct and his failure to comply with mandatory provisions of New York law. My motion pointed out that the receiver:

(a)     had not filed an oath, as required by law (CPLR 6402);

(b)     had not filed a bond or undertaking as required by law (CPLR 6403), that

---

[3] Although Prince Bakery SA is not a party to the State Court Action and is not expressly identified in any order appointing the receiver, the receiver has taken control of its assets and its bank accounts, and he has been using Prince Bakery SA's EIN for the Prince Bakery payroll.

the filing of a bond/undertaking is mandatory and not waivable, and that a receiver does not "qualify" as such until he has filed the undertaking;

(c)    had not complied with the financial and banking requirements imposed by law (22 NYCRR § 202.52), including the provisions of § 202.52(e), which provide that: "Receivers shall file with the court an accounting at least once a year"; this was never done;

(d)    had not rendered monthly reports, although they were required by the very same order that allowed him to receive *interim* commissions; and

(e)    had hired a "manager" in 2018 – someone to do the work he was hired to do – without a court order as required by law. Moreover, the receiver claims he initially hired the "manager" at a salary of $2,500 per week (or $130,000 *per annum*), even though he was not approved by the State Court, and was not on the approved fiduciary list maintained by the Fiduciary Clerk at the Office of Court Administration ("OCA"), from which all "managers" must be selected, absent a written finding by the appointing judge that there is "good cause" to hire that individual; and there is no such "finding" in the record of the State Court Action.[4]

23.    In addition, it was true in March 2020, and it remains true to this day, that ***the receiver has not filed income tax returns for either Prince, Blue Spruce, or Prince Bakery SA*** – or if he has, he has refused to provide us with copies of those returns. He certainly has not provided us with the information from which our accountants can prepare such returns. My wife and I (and our accountants) have requested this information from the receiver, but we have received no response, and we have no idea how long it has been since the receiver filed – if he ever filed –

---

[4] I learned last week that the "manager" is in fact the receiver's nephew; he is married to the receiver's niece. This nepotistic relationship had never been disclosed. Upon information and belief, the receiver hired the manager, who had no prior experience running a bakery, after he had lost his job and was unemployed.

income tax returns for any of the Debtors.

24.     The Judge presiding in the State Court Action has yet to decide our motion to discharge the receiver. But the situation continues to deteriorate.

25.     As I pointed out above, the receiver has recently advised the State Court and the parties that without a bailout from the parties he will have to close the business. The receiver has even asked the State Court that appointed him to allow him to sell the Debtors' assets in order to pay his commissions. I am advised by counsel that neither the State Court nor the receiver has such authority under New York law. (*See* note 2, *supra*.)

26.     Although my wife and I have tried to resolve the State Court Action in a way that would allow Prince and the other Debtors to remain in business, the receiver and our niece have ignored or rejected all of our overtures.

The Receiver's Paramount Preoccupation is with his Commissions

27.     Throughout the period of his receivership, the receiver has been fixated on the calculation and payment of his commissions, and the fees he wants to pay to the manager, while he has given little attention to the preservation and success of the business. (Indeed, the receiver has admitted that he merely "supervises" the work that the manager does; and I have no idea what the manager does, other than to collect the cash receipts from the route drivers and bring them to the receiver's office in Westchester. Prince's long-standing employees operate the business.)

28.     When I moved to have the receiver discharged, the receiver contended, in the summer of 2020, that he had "processed" $5,535,027.96 (since March 2017), that he had paid himself interim commissions of $131,303.71, and that he was entitled to $276,751.39, by which he meant that he was due to be paid an additional $145,447.68. Of course, the receiver ignored the fact that there was no court order awarding him final fees. Similarly, he claimed that the manager

had been paid $288,000 since February 2018 and that the manager was owed an additional $21,500.

29.     More recently, even as he advised the State Court and the parties that he had run out of money, could not buy flour and would have to close the business, the receiver was fixated on his commissions and his nephew's fees. By letter dated Thursday, January 28, 2021, the receiver advised counsel for the parties that: "As of September 2, 2020," the Manager was "owed" $21,500 and he, the receiver, was "owed" $145,447.68.

30.     And it was only after reiterating the amount he claimed was due to him and his no-show nephew that the receiver delivered the most important message**: *"We will run out of flour tonight. We will begin to furlough workers and secure the building on Friday. This demand for oil will be less when we are not baking, however the building will freeze if someone does not put oil in the tanks."* To the receiver, the viability of the Debtors' businesses is obviously subordinate to his commissions.

31.     The next day, after my attorney spent hours attempting to negotiate with the temporary receiver to find a way to keep the business open, the receiver was unwilling to make any accommodations to keep the business operating. He insisted that he be paid all of his commissions, and the manager be paid all of his fees.

32.     My wife – a 50% shareholder – refused to sit by and let the bakery that had been started by her father fail and close, and she refused to jeopardize the livelihood of the almost 20 employees and their families.

33.     Accordingly, my wife agreed to, and did, wire $24,000 to US Flour, thus paying down one of the largest (if not the largest) trade creditor, securing additional credit from that company and allowing Prince to stay open for business without interruption.

9

34.    But even as we informed the receiver that we would pay $24,000 to US Flour, he continued to use the precarious situation he had created to pressure me and my wife.

35.    The next day, by letter dated January 29, 2021, he wrote to the parties' counsel that:

*"As I informed everyone last night, we have no more flour, and the flour producer will not ship without a $12,000 payment." "We will be securing the building later afternoon today."*

36.    But even as Prince was on the brink of closing, and even as Frances agreed to pay $24,000 on behalf of Prince, the receiver was still focused on himself and his commissions. In another letter also dated Friday January 29, the receiver wrote: "I have no objection to the wire directly being made to the flour company. *However, I will be booking those funds as funds processed through the receivership*."

37.    In other words, the receiver wanted a commission on the $24,000 that my wife paid to US Flour in order keep the business open and the employees employed.

38.    On February 4, 2021, the receiver sent yet another letter, this time claiming that (a) he was now entitled to a total of $316,331.36 in commissions – $185,027.65 in addition to what he had already been paid; and (b) the manager, his nephew, was owed $44,500 – in addition to the $318,000 he had already been paid for a total of $362,500.[5] Left to his own devices, the receiver

---

[5]  To the best of my knowledge, the receiver is not entitled to any commissions because he has failed to file with OCA either (1) the orders that appointed him as receiver, or (b) OCA Form 872. In the absence of both of those filings, the receiver is prohibited from receiving an award of commissions. 22 NYCRR § 36.4(c) ("No compensation shall be awarded to an appointee who has not properly filed the notice of appointment and certificate of compliance.")

By letter dated October 6, 2020, my lawyer asked the receiver to advise if he had complied with that requirement. The receiver never responded. By letter dated October 22, 2020, my lawyer sent a copy of that letter to the State Court, noting that: "We continue to be very concerned about the viability of Prince under the less than 'watchful eye' of the Temporary Receiver," and advising the State Court that we had not received a response from the receiver. The Judge in the State Court Action has not taken any steps to address any of these issues.

I continue to be extremely concerned because there is an undisclosed relationship between the receiver and

10

would demand payment of a total aggregate compensation of $678,831.36 – more than ten percent (10%) of the $6,326,627.18[6] he claimed to have collected since he was appointed as receiver in 2017.

39.    Taken together, the receiver is now demanding a total of an additional $229,527.65 from Prince – a bakery company which he has operated since March 2017 and which no longer has enough money to buy flour. No wonder Prince can't pay its bills!

40.    Significantly, even though the receiver was able to compute his commissions to the penny, he has been unable to provide us with an accurate accounting of Prince's debts and liabilities. As I pointed out in paragraph 16, above, as recently as January 13, when he was ready to shut down Prince's business on 3-days' notice, the receiver was only able to provide us with approximate estimates, in round numbers, of some of the sums due to Prince's vendors.

41.    Put in the plainest vernacular, the continued viability of Prince's business depends on getting rid of the rogue receiver and his no-show nephew. And the viability of Blue Spruce and Prince SA depends on Prince.

42.    The Debtors' principals – my wife, a shareholder; and our two sons, who are officers of Debtors, and I – are prepared to reorganize Prince and pay back the trade debt, and the taxes and other charges on Blue Spruce's property. I have relationships with most if not all of the trade creditors and I am confident that they will work with us as I reorganize Prince, get it back on its feet, and pay the debts that the receiver has incurred but failed to pay.

---

the Judge. The Judge ran for reelection in the November 2020 elections, and the receiver was in charge of his finance committee and raised substantial sums for the Judge's re-election campaign. This relationship was never disclosed to me or my counsel.

[6]  This figure includes $396,368.18 that my wife and her sister "gave" to the receiver in May 2018 to allow him to pay the real estate taxes that were liens on the Blue Spruce property. He is certainly not entitled to a commission on those funds.

**Information Required by Rule 1007-2 of the Local Bankruptcy Rules**

43.     In addition to the foregoing, Rule 1007-2 of the Local Bankruptcy Rules requires certain information related to the Debtors, which is set forth below.

44.     Local Rule 1007-2(a)(2). These cases were not originally commenced under chapter 7 or 13 of the Bankruptcy Code.

45.     Local Rule 1007-2(a)(3). Upon information and belief, no committee was organized prior to the commencement of these chapter 11 cases.

46.     Local Rule 1007-2(a)(4). A list containing the names and addresses of holders of the Debtors' respective 20 largest unsecured claims, excluding "insiders", is annexed as Exhibit A.

47.     Local Rule 1007-2(a)(5). Upon information and belief, Blue Spruce has one secured creditor.

| Secured Creditor | Amount of Claim | Description |
|---|---|---|
| New York City Dept. of Finance Office of Legal Affairs 375 Pearl Street, 30th Floor New York, NY 10038-1442 | $149,332.84 | Tax lien for unpaid real estate taxes for Blue Spruce's property located at 2418 Belmont Avenue, Bronx, NY. |

48.     Local Rule 1007-2(a)(6). I am currently unable to provide a summary of the Debtors' assets and liabilities, as the information necessary to prepare it is in the possession of the receiver and has not been provided to the Debtors or their counsel.

49.     Local Rule 1007-2(a)(7). There are no publicly held securities of the Debtors.

50.     Local Rule 1007-2(a)(8). The Debtors' property is in the possession of the receiver:

Joseph A. Maria, Esq., 301 Old Tarrytown Road, White Plains, NY 10603; (914) 684-0333. The receiver was appointed in the State Court Action.

51.     Local Rule 1007-2(a)(9). Prince operates its business at 2418 Belmont Avenue, Bronx, New York, pursuant to a lease from Blue Spruce.

52.     Local Rule 1007-2(a)(10). The Debtors' substantial assets, and its books and records, are located at 2418 Belmont Avenue, Bronx, New York, or with the receiver; some records are maintained at my offices located at 2245 New England Thruway, Bronx, New York. No property of the Debtors is located outside the territorial limits of the United States.

53.     Local Rule 1007-2(a)(11). In addition to the State Court Action referred to above, the following action is pending against one or more of the Debtors in the Supreme Court, Bronx County: *Constance Koeper as Administratrix of The Estate of Rose Marie Koeper, as Shareholder of Prince Bakery, Inc. and Blue Spruce Corporation v. Anthony M. Rusciano, Anthony J. Rusciano, Santo S. Rusciano, Frances Rusciano, Prince Bakery Inc. and Blue Spruce Corporation*, Bronx County Index No. 28475/2020E. This is a special proceeding challenging shareholders' meetings of which Constance had actual written notice and which she knowingly failed to attend.

54.     Local Rule 1007-2(a)(12). The Debtors' affairs have been under the supervision of the receiver. They will be managed by me, Anthony M. Rusciano (I had managed and operated the business before the receiver was appointed), together with Anthony J. Rusciano and Santo S. Rusciano, the Debtors' directors and officers.

55.     Local Rule 1007-2(b)(1). The estimated amount of the weekly payroll to employees (exclusive of officers, directors, stockholders and partners) for the thirty (30) day period following the filing of the chapter 11 petition is $0.00 for Prince, $0.00 for Blue Spruce, and $15,000.00 for Prince Bakery SA. (Even though Prince is the operating entity, as I noted above, the receiver has

been using the Prince Bakery SA accounts and EIN to employ and pay the employees.)

56.    Local Rule 1007-2(b)(2). The amount paid and proposed to be paid for services for the thirty (30) day period following the filing of the chapter 11 petition to officers, stockholders and directors is $0.00 for Prince, $0.00 for Blue Spruce, and $0.00 for Prince Bakery SA.

57.    Local Rule 1007-2(b)(3). I am unable to provide a schedule, for the thirty (30) day period following the commencement of these cases, of estimated cash receipts and disbursements, net cash gain or loss, or obligations and receivables expected to accrue but remain unpaid, other than professional fees, at this time because the information required to prepare it is in the possession and control of the receiver. To the best of my information, according to the bank statement for December 2020, there were credits totaling $155,827.71, and debits totaling $165,591.88.

## Information Required by Section 1116(1) of the Bankruptcy Code

58.    I was unable to prepare a balance sheet, statement of operations or cash flow statement because, as previously discussed in paragraphs 48 and 57 of this Declaration, the information required to prepare such documents is in the possession of the receiver, and he has not been provided such information to the Debtors or their counsel.

59.    As discussed in paragraph 23, the receiver has not filed income tax returns for either Prince, Blue Spruce, or Prince Bakery SA – or if he has, he has refused to provide Debtors or me with copies of those returns. Nor has he provided us with the information from which the accountants can prepare such returns.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 9, 2021

*/s/ Anthony M. Rusciano*
Anthony M. Rusciano

# EXHIBIT "A"

Fill in this information to identify the case:

| | |
|---|---|
| Debtor name | **Prince Bakery, Inc.** |
| United States Bankruptcy Court for the: | SOUTHERN DISTRICT OF NEW YORK |
| Case number (if known): | _____ |

○ Check if this is an

amended filing

## Official Form 204

## Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders

12/15

**A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31).  Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.**

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| A-1 Gilbert Telephone Answerin P.O. Box 15395 Beverly Hills, CA 90209 | Laura Baird laura@a1gilbert.com (310) 281-0300 | Trade Payable | | | | $1,115.00 |
| AMRO Container Corp. 65 North Industry Court Deer Park, NY 11729 | (718) 704-4138 | Trade Payable | | | | $9,000.00 |
| Arctic Glacier Premium Ice 500 Fenimore Road Mamaroneck, NY 10543 | Jeff Hendler jhendler@icesurance.com (914) 490-3079 | Trade Payable | | | | $3,000.00 |
| Blue Spruce Corporation 2245 New England Thruway Bronx, NY 10475 | | Rent | | | | $188,000.00 |
| EJ Paper Company 760 Saw Mill River Road Yonkers, NY 10710 | Amil (914) 497-2013 | Trade Payable | | | | $0.00 |
| Ferrantino Fuel Corporation Mango & Iacoviello, LLP 14 Penn Plaza, Suite 1919 New York, NY 10122 | Rocco Iacoviello (212) 695-5454 | Trade Payable | | | | $22,265.72 |
| Four Suns Fuel Co. Inc. 2460 Rowe Street Bronx, NY 10461 | Pat Farrell (718) 358-4541 | Trade Payable | | | | $11,000.00 |

Software Copyright (c) 1996-2021 Best Case, LLC - www.bestcase.com                                                                                 Best Case Bankruptcy

| Debtor | **Prince Bakery, Inc.** | | Case number *(if known)* | |
|---|---|---|---|---|
| | Name | | | |

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| Joseph A. Maria, Esq. 301 Old Tarrytown Road White Plains, NY 10603 | jmariapc@jmariapc .onmicrosoft.com (914) 684-0333 | **Claimed Commissions** | **Disputed Subject to Setoff** | | | $185,027.65 |
| Michael D. Olsey 6 Tamarac Circle Harrison, NY 10528 | (914) 572-2069 | **Claimed Management Fees** | **Disputed Subject to Setoff** | | | $44,500.00 |
| NYC Water Board P.O. Box 11863 Newark, NJ 07101-8163 | | | | | | $59,184.62 |
| NYS Dept. of Labor Unemployment Insurance Divisio 2400 Halsey Street Bronx, NY 10461 | Cassandra Marcus (917) 795-0919 | | | | | $80,000.00 |
| NYS Workers Compensation Board Attn:  Finance Office 328 State Street, Room 331 Schenectady, NY 12305-2302 | | | | | | $10,239.17 |
| Panama City Products 450 Odgen Avenue Mamaroneck, NY 10543 | Don (914) 640-2304 | Trade Payable | | | | $38,000.00 |
| Sidco Foods 1628 Bathgate Avenue Bronx, NY 10457 | Xiomara (973) 286-9604 | Trade Payable | | | | $10,300.00 |
| U.S. Flour Corp. 1 Huntington Quadrangle, Suite Melville, NY 11747 | Yuri - Ron Alcalay yanive@usflour.co m (561) 945-5574 | Trade Payable | | | | $30,000.00 |

Software Copyright (c) 1996-2021 Best Case, LLC - www.bestcase.com                                        Best Case Bankruptcy

<table>
<tr><td colspan="2">Fill in this information to identify the case:</td></tr>
<tr><td>Debtor name</td><td><b>Prince Bakery SA, Inc.</b></td></tr>
<tr><td>United States Bankruptcy Court for the:</td><td><b>SOUTHERN DISTRICT OF NEW YORK</b></td></tr>
<tr><td>Case number (if known):</td><td>_____</td></tr>
</table>

○ Check if this is an

amended filing

## Official Form 204

## Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders

**12/15**

**A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31).  Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.**

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| **Joseph A. Maria, Esq. 301 Old Tarrytown Road White Plains, NY 10603** | **jmariapc@njmariapc.onmicrosoft.com (914) 572-2069** | **Claimed Commissions** | **Disputed Subject to Setoff** | | | $0.00 |
| **Michael D. Olsey 6 Tamarac Circle Harrison, NY 10528** | **(914) 572-2069** | **Claimed Management Fees** | **Disputed Subject to Setoff** | | | $0.00 |
| **NYS Workers Compensation Board Attn:  Finance Office 328 State Street, Room 331 Schenectady, NY 12305-2302** | | **Judgment** | | | | $25,000.00 |

Fill in this information to identify the case:

| | |
|---|---|
| Debtor name | **Blue Spruce Corporation** |
| United States Bankruptcy Court for the: | **SOUTHERN DISTRICT OF NEW YORK** |
| Case number (if known): | _____ |

○ Check if this is an

amended filing

## Official Form 204

### Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders

**12/15**

A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31).  Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| **Ferrantino Fuel Corporation c/o Mango & Lacoviello, LLP 14 Penn Plaza, Suite 1919 New York, NY 10122** | | **Judgment** | | | | **$1,547.72** |
| **Joseph A. Maria, Esq. 301 Old Tarrytown Road White Plains, NY 10603** | **jmariapc@jmariapc .onmicrosoft.com (914) 684-0333** | | **Disputed Subject to Setoff** | | | **$0.00** |
| **Michael D. Olsey 6 Tamarac Circle Harrison, NY 10528** | **(914) 572-2069** | | **Disputed Subject to Setoff** | | | **$0.00** |

Software Copyright (c) 1996-2021 Best Case, LLC - www.bestcase.com    Best Case Bankruptcy